THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THOMAS TURNER,

        Plaintiff,

    v.

W.W. GRAINGER, INC., an Illinois corporation; RONALD HANSEN, and his marital community; JOHN DOE MANAGERS and SUPERVISORS and their marital communities,

        Defendants.

No. C09-1068 RAJ

SECOND DECLARATION OF MARALEE M. DOWNEY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, MARALEE M. DOWNEY, declare and state as follows:

1.     I am one of the attorneys representing defendants W.W. Grainger, Inc. ("Grainger") and Ronald Hansen in this case. I am over the age of 18, competent to testify, and make this declaration based on my personal knowledge and my knowledge of the files and records maintained by my law firm, Perkins Coie LLP.

2.     Attached as Exhibit A are true and correct copies of excerpts from Helene Sherlock's deposition testimony.

3.     Attached as Exhibit B are true and correct copies of excerpts from Jake Leonard's deposition testimony.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

SIGNED at Seattle, Washington this 8th day of June, 2010.

*s/ Maralee M. Downey*, WSBA No. 38239
MARALEE M. DOWNEY, WSBA No. 38239

SECOND DECLARATION OF MARALEE M.
DOWNEY ISO DEFS' MOTION FOR SJ (No. C09-
1068 RAJ) – 2

04311-0016/LEGAL18406154.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# CERTIFICATE OF SERVICE

I certify that on June 8, 2010, I caused the foregoing **SECOND DECLARATION OF MARALEE M. DOWNEY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following individuals of record:

Mary Ruth Mann and James W. Kytle          Attorneys for Plaintiffs
Law Offices of Mann and Kytle, PLLC
200 Second Avenue West
Seattle, WA  98119

Dated this 8th day of June, 2010, at Seattle, Washington.


_____*s/ Janet Davenport*_____
Janet Davenport, Legal Secretary

CERTIFICATE OF SERVICE (No. C09-1068 RAJ) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

04311-0016/LEGAL18406154.1

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE


THOMAS TURNER,

        Plaintiff,

       vs.              NO. C09-1068RAJ

W. W. GRAINGER, an Illinois

corporation; RONALD HANSEN,

and his marital community,

JOHN DOE MANAGERS and

SUPERVISORS and their marital

communities,

        Defendants.

               /


DEPOSITION OF HELENE SHERLOCK

SAN FRANCISCO, CALIFORNIA

FRIDAY, MAY 14, 2010

# Exhibit A

REPORTED BY:  E. BRUIHL, CLR, RPR, CSR NO. 3077

**Second Declaration
of M. Downey - 4**
     A REGISTERED PROFESSIONAL REPORTER

STAR REPORTING SERVICE, INC.   (415) 348-0050

DEPOSITION OF HELENE SHERLOCK, TAKEN ON FRIDAY,  MAY 14, 2010

Page 2

1   UNITED STATES DISTRICT COURT

2   FOR THE WESTERN DISTRICT OF WASHINGTON

3   AT SEATTLE

4

5   THOMAS TURNER,

6            Plaintiff,

7       vs.                    NO. C09-1068RAJ

8   W. W. GRAINGER, an Illinois

9   corporation; RONALD HANSEN,

10  and his marital community,

11  JOHN DOE MANAGERS and

12  SUPERVISORS and their marital

13  communities,

14           Defendants.

15                          /

16

17

18

19

20       Deposition of HELENE SHERLOCK on behalf of

21  plaintiff FRIDAY, MAY 14, 2010, at 11:00 A.M.,

22  before Easteller Bruihl, CSR No. 3077, a licensed

23  and Certified California Shorthand Court Reporter

24  for Star Reporting Service, Inc., 703 Market Street,

25  Suite 1007, San Francisco, CA 94103

**Second Declaration**
**of M. Downey - 5**

DEPOSITION OF HELENE SHERLOCK, TAKEN ON FRIDAY,  MAY 14, 2010

Page 3

1                         --oOo--

2                 A P P E A R A N C E S

3    FOR THE PLAINTIFF:

4              LAW OFFICES OF MANN AND KYTLE, PLLC

5              BY:  MARY RUTH MANN, ESQ.

6              200 Second Avenue West

7              Seattle, WA 98119

8              Tel:  (206) 587-2700

9              mrmann@mrmannlaw.com

10   FOR DEFENDANT:

11             PERKINS COIE LLP

12             BY:  CALVIN L. KEITH, ESQ.

13   and       HANK GALATZ, ESQ. (Via telephone)

14             1120 N.W. Couch Street

15             Tenth Floor

16             Portland, OR 97209-4128

17             Tel:  (503) 727-2006

18             Fax:  (503) 346-2006

19             ckeith@perkinscoie.com

20

21

22

23

24

25   **Second Declaration**
     **of M. Downey - 6**

DEPOSITION OF HELENE SHERLOCK, TAKEN ON FRIDAY,  MAY 14, 2010

Page 8

1                    HELENE SHERLOCK,

2    having first been duly sworn and/or affirmed to tell

3    the truth, the whole truth and nothing but the

4    truth, under oath, testified as follows:

5

6                    EXAMINATION BY MS. MANN

7    Q.    So, Ms. Sherlock, could you give us your full

8    name, please, and the title that you currently have

9    with Grainger?

10   A.    My name is Helene Sherlock, and I'm a Regional

11   Human Resource Manager for Grainer.

12   Q.    Okay.

13          In that position, have you ever had your

14   deposition taken before about something that relates

15   to Grainger?

16   A.    No.

17   Q.    And have you ever had your deposition taken

18   before at all?

19   A.    Yes.

20   Q.    Okay, and did that have anything to do with

21   Human Resources matters or?

22   A.    Yes.

23   Q.    And what was that about?

24   A.    That was with a different organization

25   regarding a -- an employee relations issue.

**Second Declaration of M. Downey - 7**

DEPOSITION OF HELENE SHERLOCK, TAKEN ON FRIDAY, MAY 14, 2010

Page 64

1    Liston.

2    Q.    Okay, and then was there another one that --

3    A.    There were additional performance improvement

4    plans written by Chris Bader.

5    Q.    Okay, and about how long total did Duane Morgan

6    have to improve or to meet the objectives of the

7    plan?

8    A.    Approximately ninety to a hundred and

9    twenty days.

10   Q.    And was that for each plan?  Or all together?

11   A.    All together.

12   Q.    What was the time frame of his PIPs to the best

13   of your memory?  What year?

14   A.    To the best of my recollection, it was early

15   2009.

16   Q.    And what was the outcome?

17   A.    To the best of my recollection, I believe he

18   was terminated.

19   Q.    And how old was Mr. Morgan?

20   A.    I would estimate that he is over fifty.

21   Q.    Okay.  Do you have an idea how far over 20?

22   A.    I do not know.  I do not recall.  I simply

23   cannot recall that.

24   Q.    When a termination is taking place, do you pay

25   attention to the age of the person?

**Second Declaration
of M. Downey - 8**

DEPOSITION OF HELENE SHERLOCK, TAKEN ON FRIDAY, MAY 14, 2010

Page 65

 1   A.   Yes.

 2   Q.   Was Mr. Morgan old enough that he could retire?

 3   A.   I am not aware of that.

 4   Q.   So, you haven't processed retirement paperwork

 5   on him?

 6   A.   I never process retirement paperwork.

 7   Q.   Who does that?

 8   A.   That is done at Lake Forrest on the behalf of

 9   the employee -- at the request of the employee.

10   Q.   And what do you mean "at the request"?

11   A.   The employee would make that decision.

12   Q.   Uh-huh, and you wouldn't take action on that?

13   A.   That doesn't -- I don't process a retirement.

14   That's not an area that I support.

15   Q.   Well, if a person who was about to be

16   terminated indicated that they would like to retire,

17   what would you do with them?

18   A.   I would have to have discussions to understand

19   that situation.

20   Q.   Would a person who was on a PIP plan have the

21   option of retiring if they met the age and number of

22   years requirements?

23   A.   I actually have never -- let me say I would

24   have to talk -- I have never had that happen.

25   O.   Okay.

**Second Declaration
of M. Downey - 9**

DEPOSITION OF HELENE SHERLOCK, TAKEN ON FRIDAY, MAY 14, 2010

Page 128

1    Q.    Okay.

2          So, immediately prior to Steve Welch going

3    to Seattle, you called Chris Garlieb to give him a

4    heads-up that Mr. Welch was coming into the

5    territory?

6    A.    That's correct.

7    Q.    Prior to calling Ms. Garlieb, what was the

8    incident before that in relation to the interview of

9    Tom Turner by Mr. Welch?

10   A.    These notes validate that I had a conversation

11   with each of them and that is what I did, to my best

12   recall.

13   Q.    Okay.  Now, where in these notes are the notes

14   about what you said to Chris Garlieb?

15   A.    I don't have notes as to what I said to Chris

16   Garlieb.

17   Q.    And what was the reason for that?

18   A.    I don't have notes for a hundred percent of my

19   calls.

20   Q.    Okay.  Can you give me an estimate of what

21   percentage you do take notes about?

22   A.    I would just be guessing.

23   Q.    In the tablet that you found that you had kept

24   notes on that you transcribed in the Grainger 2234

25   and 2235, are there other notes about other issues

**Second Declaration
of M. Downey - 10**

DEPOSITION OF HELENE SHERLOCK, TAKEN ON FRIDAY,  MAY 14

1        REPORTER'S CERTIFICATION OF CERTIFIED COPY

2

3

4

5

6

7        I, EASTELLER BRUIHL, CSR NO. 3077, a Certified

8    Shorthand Reporter in the State of California,

9    certify that the foregoing Pages 1 through 200,

10   constitute a true and correct copy of the original

11   deposition of HELENE SHERLOCK, taken on FRIDAY, MAY

12   14, 2010.

13       I declare under penalty of perjury under the

14   laws of the State of California that the foregoing

15   is true and correct.

16

17       Dated this 17TH day of MAY 2010.

18

19

20       EASTELLER BRUIHL, CSR NO. 3077

21

22

23

24

25

STAR REPORTING SERVICE, INC.    (415) 348-0050

**Second Declaration
of M. Downey - 11**

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

THOMAS TURNER,

      Plaintiff,

v.                                No. C09-1068RAJ

W.W. GRAINGERS, an Illinois

Corporations, RONALD HANSEN, and his

marital community, JOHN DOE

MANAGERS and SUPERVISORS and

their marital communities,

      Defendants.

---

DEPOSITION OF:

JAKE LEONARD

---

9:00 a.m.

March 23, 2010

200 Second Avenue West, Seattle, Washington

KATHERINE MAC DONELL

COURT REPORTER

1774 RUSSELL STREET

POULSBO, WASHINGTON  98370

(360) 779-3817

**Second Declaration** ——— **Exhibit B** ————
**of M. Downey - 12**

```
 1                    APPEARANCES

 2   FOR THE PLAINTIFF:  Mary Ruth Mann

 3                       Mann & Kytle

 4                       200 Second Avenue West

 5                       Seattle, Washington  98119

 6

 7   FOR THE DEFENDANT:  Brian Flock

 8                       Hank Galatz (via telephone)

 9                       Perkins Coie

10                       1120 N.W. Couch Street, Tenth Floor

11                       Portland, Oregon  98209-4128

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Second Declaration
of M. Downey - 13**

Deposition of: Jake Leonard, 3/23/10

1   JAKE LEONARD,                    having been first duly sworn

    by the Notary, deposed and

2                                    testified as follows:

3                        * * * * * * *

4                        EXAMINATION

5   BY MS. MANN:

6       Q    Mr. Leonard, thank you for coming.  As you know,

7   my name is Mary Ruth Mann and I represent Tom Turner in an

8   action regarding his termination from Grainger.

9       A    Okay.

10      Q    As I understand it, you're are still working for

11  Grainger; is that right?

12      A    Yes.

13      Q    And what's your present position?

14      A    I'm government account manager.

15      Q    All right.  And could you give us your full name

16  for the court reporter?

17      A    Jacob Uriah Leonard.

18      Q    Could you spell that please?

19      A    J-a-c-o-b, U-r-i-a-h, L-e-o-n-a-r-d.

20      Q    Thank you.  How long have you worked for

21  Grainger?

22      A    Since April of 2006.

23      Q    And what was your first position with them?

24      A    Customer service manager in Las Vegas.

25      Q    In Las Vegas.  As a customer service manager

1          MR. FLOCK:  Objection.  Lacks

2   foundation, calls for speculation.

3     A     Ponderosa Heating was only doing the

4   installation.

5     Q     (By Ms. Mann) And someone who's qualified to use

6   refrigerant has to do that, correct?

7     A     Correct.  Can only sell to them or have them

8   install it.

9     Q     So this was a sale to someone in Oregon where

10  Ponderosa Heating was going to receive it and do an

11  installation, correct?

12         MR. FLOCK:  Objection.  Lack

13  foundation, calls for speculation.

14    A     As far as I remember.

15    Q     (By Ms. Mann) Okay.  Was there anything about

16  this that caused you any concern at the time in terms of

17  how it was being done or the proper procedure with respect

18  to Grainger?

19         MR. FLOCK:  Objection to form.  Vague,

20  compound.

21    A     As long as it was for a Boeing employee or a

22  retired employee, then it would have been okay.

23    Q     (By Ms. Mann) Okay.  And do you recall -- do you

24  recall sales to non-Boeing employees also going through

25  that account at the Everett branch?

Deposition of: Jake Leonard. 3/23/10
**Second Declaration**
**of M. Downey - 15**

1           MR. FLOCK:  Object to the form.

2           You can answer.

3      A    There may have been from time to time, but folks

4   were instructed not to, they were supposed to ask whether

5   it's a Boeing employee or a retired Boeing employee.

6      Q    (By Ms. Mann) And first my question is, do you

7   remember that sales on that account were made to people

8   who were non-Boeing employees with the knowledge of you or

9   Sherry Smith as branch manager?

10          MR. FLOCK:  Objection.  Vague, calls

11  for speculation, lacks foundation, assumes facts.

12          You can answer.

13     A    There is no way I could verify that now.

14     Q    (By Ms. Mann) Okay.  And that's because the

15  Boeing employee sales number was pretty widely

16  distributed; isn't that correct?

17          MR. FLOCK:  Objection.  Assumes facts,

18  calls for speculation, lacks foundation.

19     A    How do you mean?

20          MS. MANN:  Let's mark that as an

21  exhibit.

22          (Exhibit No. 2 marked for

23          identification.)

24     Q    (By Ms. Mann) Do you remember seeing this flyer

25  or one similar to it?

Deposition of: Jake Leonard. 3/23/10
**Second Declaration
of M. Downey - 16**

Page 33

1    somebody?

2        A    You are going to need two more digits.

3        Q    I see.

4        A    Or, let's see, yeah, it looks like there are

5    seven digits; is that correct?  Yeah, should be seven

6    digits, it's cut off.

7        Q    Okay.  So is this a normal way of handling sales

8    for the Boeing employee customer account, are each of

9    these a normal way that merchandise could be sold on that

10   account?

11                   MR. FLOCK:  Objection.  Lacks

12   foundation, calls for speculation.

13       A    Normal way is as in them walking into the branch

14   or calling in.

15       Q    (By Ms. Mann) And they can also go online and

16   have merchandise delivered to their home or branch,

17   correct?

18                   MR. FLOCK:  Same objections.

19       A    If they have the account number.

20       Q    (By Ms. Mann) Okay.  Now, do you have any way to

21   know what information Lance Brown gave the branch employee

22   in order to set up either of the sales that are made in

23   the name of caller Lance Brown?

24                   MR. FLOCK:  Objection.  Vague.

25       A    It would come in one of three ways:  It would be

1  given to us by the account manager, that would be pretty

2  much no questions asked after that point; if they came up

3  to the counter, we'd ask for ID or a way of verifying that

4  they are a Boeing employee or a retired Boeing employee;

5  and if it's over the phone we generally, if their name is

6  already in SAP, chances are they have been checked

7  already.

8      Q    (By Ms. Mann) Now, have you ever seen any

9  written instructions on how to use that account?

10     A    I have not.

11     Q    Okay.  And when do you have a recollection of

12 telling branch employees to check ID; do you remember when

13 that would have happened?

14                 MR. FLOCK:  Objection.  Assumes facts.

15     A    As far as I can remember, so from the time I got

16 there.

17     Q    (By Ms. Mann) Okay. Now, if Mr. -- well, let me

18 ask this:  The phone people wouldn't being checking ID,

19 correct?

20                 MR. FLOCK:  Objection.  Calls for

21 speculation.

22     A    No.  They could put it in special instructions

23 if their name is not in SAP to check ID upon arrival.

24     Q    (By Ms. Mann) But there aren't any instructions

25 like that on anything we've seen, correct?

1    privileged communication.  The witness can answer to the

2    extent that the conversations were not with an attorney.

3        Q    (By Ms. Mann) You can go ahead.

4        A    I haven't had any conversation and there is no

5    way to verify one way or another, because I don't do every

6    transaction.

7        Q    Sure.  But you did some of these, correct?

8        A    I did some of those.

9        Q    And if I were tell you that Lance Brown is not a

10   Boeing employee but was a small businessman, would you

11   have any fear that you would be disciplined for having

12   sold something to him?

13                   MR. FLOCK:  Objection.  Calls for

14   speculation, assumes facts, vague.

15       A    No, because it wasn't intentional.

16       Q    (By Ms. Mann) Okay.  And do you know what the

17   history at the Everett plant was when Sherry Smith was

18   there in terms of using that account for sales to people

19   who didn't have Grainger accounts set up?

20                   MR. FLOCK:  Objection.  Assumes facts,

21   lacks foundation.

22       A    I do not.

23       Q    (By Ms. Mann) Okay.  Would it be fair to say

24   that you knew that Tom Turner was using that account to

25   make sales?

1          MR. FLOCK:  Objection.  Assumes facts,

2    lacks foundation.

3      A    Yeah, at our -- at the trade shows we'd hand out

4    that and, you know, if they needed products on the side,

5    because a lot of Boeing employees have -- they do a lot of

6    odd jobs and things, so they bought -- they need --

7    they're in need for a lot of the specialized tools that we

8    have.

9      Q    (By Ms. Mann) And Boeing employee have families

10   that could use this, correct?

11         MR. FLOCK:  Objection.  Calls for

12   speculation.

13     A    No, because if -- they would have to have a

14   Boeing employee.

15     Q    (By Ms. Mann) They would have to have the

16   account number?

17     A    Well, they'd have -- no, they'd have to show ID

18   when they came in, to initially start.

19     Q    The flyer that you sent out just says in the box

20   after, My company has an existing account number with

21   Grainger, enter the account number, correct?

22         MR. FLOCK:  Objection.  The document

23   speaks for itself.

24     Q    (By Ms. Mann) There is nothing about ID?

25     A    No, that's an internal process that we would do

1    contact was in HR?

2                          MR. FLOCK:  Objection.  Assumes facts.

3         A    Gosh, what was her name.  I can't remember her

4    name.  But it's different -- HR on the branch side has a

5    different person than HR on the account manager side.  And

6    I believe even commercial and government have different HR

7    people.

8         Q    (By Ms. Mann) Okay.  Did you ever discipline a

9    branch employee for selling on the Boeing employee

10   customer account?

11                         MR. FLOCK:  Objection.  Lacks

12   foundation, assumes facts.

13        Q    (By Ms. Mann) On that number without it being a

14   Boeing employee or without checking ID, that kind of

15   issue?

16                         MR. FLOCK:  Same objections.

17        A    No.

18        Q    (By Ms. Mann) Okay.  So not even -- not even

19   step one oral warnings, right?

20                         MR. FLOCK:  Same objections.

21        A    No.  But during our morning stand-ups it was a

22   constant emphasis.

23        Q    (By Ms. Mann) And do you -- did you document

24   your morning stand-ups in your electronic notebook or

25   anywhere else?

1    A    Not the morning.  Not the -- the stand-ups were

2  they give us a topic to talk about and then we talk about

3  other issues afterwards.

4    Q    Okay.  And when was the first time that the

5  issue came up in the branch that you -- strike that.

6         Did someone from corporate ever tell you to do

7  this morning stand-up about the Boeing employee account?

8    A    No.

9    Q    And when is the first time you thought you

10 needed to do a morning stand-up about the Boeing employee

11 account?

12                 MR. FLOCK:  Objection.  Vague, assumes

13 facts.

14   A    I don't know -- I don't know a specific date.

15   Q    (By Ms. Mann) Do you remember any event that

16 caused you to start doing that?

17   A    No.

18   Q    Okay.  And would you agree with me that the

19 purchase order process did not require any documentation

20 of a Boeing employee's ID?

21                 MR. FLOCK:  Objection.

22 Mischaracterizes the prior testimony, asked and answered.

23   A    As an attached to the file?

24   Q    (By Ms. Mann) I'm saying any place in the file,

25 that there is no part of the process in the paperwork that

Deposition of: Jake Leonard, 3/23/10

**Second Declaration**
**of M. Downey - 22**

Page 48

1   requires Boeing employee identification?

2                    MR. FLOCK:  Objection.  Assumes facts,

3   lacks foundation, mischaracterizes prior testimony.

4       A    It was a branch process to check ID.

5       Q    (By Ms. Mann) Okay.  And would you agree that

6   there's no place that that's documented anywhere in the

7   records of sales?

8                    MR. FLOCK:  Objection.  Calls for

9   speculation, lacks foundation.

10      A    I don't see anywhere that it's documented.

11      Q    (By Ms. Mann) Okay.  And if people who bought

12  through the Boeing Employee account online at the branch

13  and who picked up merchandise there said that their ID was

14  never checked by branch personnel, would you think that

15  was probably accurate?

16                   MR. FLOCK:  Objection.  Calls for

17  speculation, lacks foundation, assumes facts, incomplete

18  hypothetical.

19      A    Can you repeat the question?

20      Q    (By Ms. Mann) Sure.  If customers, Grainger

21  customers who bought using the Boeing account number, were

22  to say that, you know, they bought online or picked things

23  up at the branch and no ID was ever checked, would you

24  think that was probably accurate?

25                   MR. FLOCK:  Same objections.

1     A     It's possible, if account manager endorsed

2  beforehand.

3     Q     (By Ms. Mann) And to your knowledge, did the

4  account manager have the authority to make sales through

5  that account, however they had been instructed?

6                    MR. FLOCK:  Objection.  Assumes facts,

7  lacks foundation, calls for speculation.

8     A     Account managers cannot place orders.  They can

9  have customer service associates place orders for them.

10    Q     (By Ms. Mann) So if the customer service

11  associates are not asking for ID to place orders with the

12  Boeing account, then that's -- that would be the place

13  where you could control it, correct?

14                    MR. FLOCK:  Objection.  Calls for

15  speculation, lacks foundation, assumes fact.

16    A     That's as far as I can control it.

17    Q     (By Ms. Mann) Right.  And when your customer

18  salespeople took orders from Tom Turner on the Boeing

19  employee account, would you agree they didn't ask him for

20  any identification for a Boeing employee?

21                    MR. FLOCK:  Objection.  Vague, assumes

22  facts, calls for speculation.

23    A     They would not ask Tom Turner for Boeing

24  employee IDs.

25    Q     (By Ms. Mann) Okay.  Would you agree that

Page 53

1      Q     (By Ms. Mann) Right.

2                        MR. FLOCK:   Same objections.

3      A     I don't recall.

4      Q     (By Ms. Mann) So you don't recall ever hearing

5  that that was a subject of discipline, correct?

6                        MR. FLOCK:   Objection.   Asked and

7  answered.

8      A     Correct.

9      Q     (By Ms. Mann) Do you know whether Grainger made

10 a profit on purchases that were made through the Boeing

11 employee account?

12     A     I do not.

13     Q     And do you know what the discount was on that

14 account?

15     A     I do not.

16     Q     Do you recall assisting Tom Turner with purchase

17 of a home furnace for his father?

18                        MR. FLOCK:   Objection.   Assumes facts.

19     A     Do you have a document?

20     Q     (By Ms. Mann) I think it may be the document

21 we've already looked at.   Does that refresh your memory,

22 the condenser?

23     A     I remember helping him with this one, I don't

24 remember the specifics.

25     Q     Let me hand you another document just to see if

**Second Declaration
  of M. Downey - 25**

Page 54

1    that refreshes your memory.

2        A    I don't recall the order.

3        Q    Do you recall making the arrangements through

4    the Oregon branch in order to deliver something to Tom's

5    dad?

6        A    I remember on this one because it needed the --

7        Q    Refrigerant?

8        A    -- the refrigerant card.

9        Q    Okay.  And --

10       A    And that is how I was involved.

11       Q    And that's Exhibit -- do we have a number on

12   that one?

13       A    This one is Exhibit 1.

14       Q    Exhibit 1, okay.  And from this form can we tell

15   who the sales assistant or customer service person was

16   that wrote up this order?

17       A    From this form, no.

18       Q    So Grainger would have another form that would

19   show who in the branch handled this?

20       A    Correct.

21       Q    And do you think it was likely to be you that

22   helped Tom write that one up?

23                        MR. FLOCK:  Objection.  Calls for

24   speculation.

25       A    It could have been.

Deposition of: Jake Leonard. 3/23/10
**Second Declaration
of M. Downey - 26**

1    Q    (By Ms. Mann) And did you think that you were

2  doing anything wrong in assisting Tom Turner in making a

3  sale of a furnace to his dad?

4                    MR. FLOCK:  Objection.  Vague.

5    A    I don't know if I was ever told that was for his

6  father.  I wouldn't question the integrity of an account

7  manager.

8    Q    (By Ms. Mann) Sure.  And with respect to Tom

9  Turner, would you agree that you didn't ever have reason

10  to question his integrity during the time you worked with

11  him?

12                    MR. FLOCK:  Objection.  Vague, calls

13  for speculation, lacks foundation.

14    A    Correct.

15                    MS. MANN:  I'm just going to print

16  another page here.  Let's mark this as Exhibit No. 5.

17                    (Exhibit No. 5 marked for

18                    identification.)

19    Q    Would you agree we would need to see the screen

20  print from the order that Exhibit 5 relates to, to see

21  what the shipping instructions were and the arrangements?

22                    MR. FLOCK:  Objection.  Calls for

23  speculation, lacks foundation.

24    A    You would need another screen print to see if

25  there was anything inputted in the customer contact notes.

1    Q    And if the -- would you agree you knew that Tom

2    Turner didn't live in Redmond, Oregon?

3                    MR. FLOCK:  Lacks foundation.

4    A    As far as I know, I don't know where he lives,

5    to start with.

6    Q    (By Ms. Mann) Mr. Leonard, are you concerned --

7    I mean, you still for work Grainger today, correct?

8    A    Correct.

9    Q    Would you agree that it wouldn't have occurred

10   to you back in -- what's the date of this, 2008, May of

11   2008?

12   A    June.

13   Q    June?

14   A    6-11.

15   Q    Okay.  That it wouldn't have occurred to you at

16   that time that there would be a problem with Tom Turner

17   selling a furnace to his dad --

18                    MR. FLOCK:  Objection.  Are you

19   finished with your question before I lodge the objections?

20                    MS. MANN:  Counsel, why don't you just

21   wait until I'm finished.

22                    MR. FLOCK:  Well, I can't tell, you

23   paused, and so I was asking politely to ask.  So finish

24   your question.  Go ahead.

25   Q    (By Ms. Mann) Would you agree that in mid-2008

1    it would not have occurred to you that there was anything

2    wrong with this sale and the way Tom Turner was doing it?

3                      MR. FLOCK:  Objection.  Lacks

4    foundation, calls for speculation.

5        A    If he would have mentioned that it was his dad,

6    I would not have done it or had one of my people do it.

7        Q    (By Ms. Mann) And so when it was shipped to a C.

8    Turner in Redmond, Oregon, you think that neither you nor

9    your people were aware that Tom Turner was doing a furnace

10   for his dad?

11                     MR. FLOCK:  Objection.  Lacks

12   foundation, calls for speculation.

13       A    How would we know unless he told us?

14       Q    (By Ms. Mann) Perhaps because you had to send

15   the condenser unit to a --

16       A    To an address.

17                     MR. FLOCK:  Objection.

18       Q    (By Ms. Mann) To a business close to his dad's

19   home where it could be received and installed.

20                     MR. FLOCK:  Objection.  Argumentative,

21   calls for speculation.

22       A    Are we talking about Exhibit 1 or 5 now?

23       Q    (By Ms. Mann) Let's Look at Exhibit 1.

24   Exhibit 1 is done on the same day and done by you,

25   correct?

1    the Everett site.

2        Q    All right.  So the Boeing internal CTO account

3    might be accessible to all locations; is that what you're

4    are thinking?

5                         MR. FLOCK:  Objection.  Calls --

6        Q    (By Ms. Mann) Or other locations?

7                         MR. FLOCK:  Lacks foundation, calls

8    for speculation.

9        A    It could be tied to a different facility.  But I

10   don't have any knowledge of that.

11       Q    (By Ms. Mann)  And did -- when -- well, let me

12   ask this:  Was Tom Turner authorized as you understood it

13   to purchase on this account?

14                         MR. FLOCK:  Objection.  Vague,

15   compound, lacks foundation, calls for speculation.

16       A    Which account?

17       Q    (By Ms. Mann) Any Boeing employee account that

18   was handled at your branch.

19       A    Him personally?

20       Q    Yes.

21       A    No.

22                         MR. FLOCK:  Objection.  Calls for

23   speculation.

24       Q    So do you know why throughout the time that you

25   were there purchases would be made where his name was on

Deposition of: Jake Leonard. 3/23/10

**Second Declaration**
**of M. Downey - 30**

# C E R T I F I C A T E

STATE OF WASHINGTON)

COUNTY OF KITSAP   )

I do hereby certify:

That I am a Notary Public in and for the State of Washington;

That each witness before examination was by me duly sworn to testify to the truth, the whole truth and nothing by the truth;

That the foregoing deposition was taken stenographically by me and reduced to transcript form under my direction;

That I am not a relative or employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

That each witness was given the opportunity to read and sign the deposition after the same was transcribed, unless indicated in the record that the parties and each witness waived the signing;

That all objection made at the time of said examination to my qualifications of the manner of taking the deposition, or to the conduct of any party, have been noted by me upon said deposition;

1    That the deposition as transcribed is a full, true

2  and correct transcript of the testimony, including

3  questions and answers, and all objections, motions, and

4  exceptions of counsel made and taken at the time of the

5  foregoing examination;

6    That I have made arrangements for delivery of the

7  deposition to the appropriate place of filing.

8    IN WITNESS HEREOF, I have hereunto set my hand

9  and affixed by official seal this 17th day of May 2010.

10

11

12

13    *Katherine Mac Donell*

14    Notary Public in and for
      the State of Washington,
15    residing in Poulsbo.
      Commission expires 5/3/08
16    CCR#:2206

17

18

19

20

21

22

23

24

25